EXHIBIT A

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| ALASKA MARINE LINES, INC., a Washington corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>DUNLAP TOWING COMPANY, a Washington corporation,<br><br>Defendant, | CASE NO.:<br><br>**COMPLAINT** |

COMES NOW Alaska Marine Lines, Inc. ("AML"), and for its Complaint, hereby alleges upon information and belief:

## I. PARTIES

1.1 Plaintiff AML is a Washington corporation with its principal place of business in SeaTac, Washington.

1.2 Defendant Dunlap Towing Company ("Dunlap") is a Washington corporation with its principal place of business in La Conner, Washington.

## II. JURISDICTION AND VENUE

2.2 This Court has jurisdiction over this action pursuant to the "saving to suitors" clause of 28 U.S.C. § 1333(1).

2.3 Venue is proper pursuant to RCW 4.12.080, because Dunlap and AML entered into a contractual agreement designating Seattle as the exclusive venue for this litigation.

\\

COMPLAINT – 1

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
1325 FOURTH AVENUE, SUITE 1650
SEATTLE, WASHINGTON 98101
206-838-7555

## III. RELEVANT FACTS

3.1     This lawsuit relates to damage sustained by the barge NANA PROVIDER (No. 1197833) while being towed by the vessel POLAR KING (No. 554888) in the vicinity of Seymour Narrows, British Columbia, on or about November 9, 2019.

3.2     On or about May 10, 2012, Dunlap entered into a Standing Time Charter ("STC") agreement with Northland Services, Inc., AML's predecessor. On or about March 16, 2014 AML was substituted for Northland Services, Inc., with Dunlap's express knowledge and consent. A true and correct copy of the STC and the March 16, 2014 assignment and amendment of the STC is attached hereto as **Exhibit 1**.

3.3     Pursuant to the STC, Dunlap agreed that Seattle was the exclusive venue for litigation arising out of the agreement. *See* Exhibit 1 at p. 8 ¶ 19.

3.3     Pursuant to the STC, Dunlap agreed to provide AML with specified tugs on a time charter basis for the purposes of providing towage and other services. *See* Exhibit 1 at p.1 ¶ 1. The specified tugs included the POLAR KING. *See* Exhibit 1 at p.13.

3.4     The STC provided that Dunlap shall have exclusive control over the POLAR KING, with the manner and means of performance of the transportation services provided to AML left to the judgment, discretion, direction, and control of Dunlap and the master of the POLAR KING. *See* Exhibit 1 at p.3 ¶ 5.B.

3.5     The STC further provided that Dunlap would maintain certain insurance coverage, including tower's liability insurance endorsed to be solely responsible for all first party loss or damage to AML's barges, including the NANA PROVIDER. *See* Exhibit 1 at p.4 ¶ 9.C(3).

3.6     On or about November 9, 2019, pursuant to the STC agreement, the Dunlap tug POLAR KING was underway in the general vicinity of Seymour Narrows, British Columbia. POLAR KING was towing the AML barge NANA PROVIDER astern at that time. POLAR KING was in exclusive control of the NANA PROVIDER.

COMPLAINT – 2

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
1325 FOURTH AVENUE, SUITE 1650
SEATTLE, WASHINGTON 98101
206-838-7555

3.7 Seymour Narrows is within the Inside Passage, a well-travelled and accurately charted waterway. Seymour Narrows is well known for very strong tidal currents.

3.8 While waiting for favorable conditions to transit Seymour Narrows, the POLAR KING's master and crew failed to exercise reasonable care for the NANA PROVIDER, allowing the NANA PROVIDER to run aground adjacent to Quadra Island.

3.9 The grounding caused substantial damage to the NANA PROVIDER. Numerous frames on the vessel's starboard side sustained bottom upset and internal structural damage. Five tanks were severely damaged as well.

3.10 Following the grounding, the NANA PROVIDER had to be refloated, and temporary repairs made so the vessel could be transported to a facility for permanent repairs. The vessel was then towed to a repair facility, and extensive repairs were made. Upon completion of repairs, surveys were required before the vessel could be placed back in service.

3.11 AML incurred substantial damages as the result of the grounding. AML's damages exceed U.S. $6 million, the exact amount to be proven at trial.

### IV.　FIRST CAUSE OF ACTION: NEGLIGENCE

4.1 AML incorporates by reference paragraphs 1.1 to 3.11 as though fully set forth herein.

4.2 Dunlap owed AML a duty of reasonable care with respect to the barge NANA PROVIDER.

4.3 Dunlap breached that duty by allowing the NANA PROVIDER to run aground, resulting in damage to the vessel.

4.4 As the direct and proximate consequence of Dunlap's breach of duty, AML sustained damages in an amount to be proven at trial.

### V.　SECOND CAUSE OF ACTION: BREACH OF CONTRACT

5.1 AML incorporates by reference paragraphs 1.1 to 4.4 as though fully set forth herein.

COMPLAINT – 3

LAW OFFICES OF
NICOLL BLACK & FEIG
A PROFESSIONAL LIMITED LIABILITY COMPANY
1325 FOURTH AVENUE, SUITE 1650
SEATTLE, WASHINGTON 98101
206-838-7555

5.2    The STC agreement is a valid and enforceable contract.

5.3    Pursuant to paragraph 9 of the STC agreement, Dunlap was obligated to maintain certain insurance against liabilities, including but not limited to tower's liability insurance that would be responsible for all first party loss or damage to the NANA PROVIDER in the circumstances of this case.

5.4    Dunlap breached paragraph 9 of the STC agreement because its liability insurance has failed to provide coverage for the full amount of the first party loss or damage the NANA PROVIDER sustained in the grounding incident described in paragraph 3.8.

5.5    As the direct and proximate result of Dunlap's breach of contract, AML sustained damages in an amount to be proven at trial.

### VI.    THIRD CAUSE OF ACTION: GROSS NEGLIGENCE

6.1    AML incorporates by reference paragraphs 1.1 to 5.5 as though fully set forth herein.

6.2    Dunlap owed AML a duty of reasonable care with respect to the barge NANA PROVIDER.

6.3    Dunlap breached that duty by allowing the NANA PROVIDER to run aground, resulting in damage to the vessel.

6.4    Dunlap failed to exercise even slight care for the NANA PROVIDER by allowing the vessel to run aground.

6.5    Dunlap's failure to exercise even slight care directly and foreseeably caused AML to sustain damages in an amount to be proven at trial.

### VII.    PRAYER FOR RELIEF

WHEREFORE, AML prays for judgment against Dunlap as follows:

1.    For damages in an amount to be determined at the time of trial;

2.    For prejudgment and post-judgment interest in an amount allowed by law;

COMPLAINT – 4

LAW OFFICES OF
NICOLL BLACK & FEIG
A PROFESSIONAL LIMITED LIABILITY COMPANY
1325 FOURTH AVENUE, SUITE 1650
SEATTLE, WASHINGTON 98101
206-838-7555

3. For attorneys' fees, costs and expenses of suit as allowed by contract and/or law;

4. For such other relief as the Court may deem just and proper.

**DATED** this \_\_\_7th\_\_\_ day of June, 2021.

                                        NICOLL BLACK & FEIG PLLC

                                        /s/ Christopher W. Nicoll

                                        Christopher W. Nicoll, WSBA No. 20771
                                        *Attorneys for Plaintiff Alaska Marine Lines, Inc.*

COMPLAINT – 5

LAW OFFICES OF
**NICOLL BLACK & FEIG**
A PROFESSIONAL LIMITED LIABILITY COMPANY
1325 FOURTH AVENUE, SUITE 1650
SEATTLE, WASHINGTON 98101
206-838-7555

# Exhibit 1

## Assignment and Amendment
## of
## Standing Time Charter

The undersigned desire to assign and amend that certain Standing Time Charter between Dunlap Towing Company as Owner, and Northland Services, Inc. ("NSI") as Charterer, dated May 10, 2012 (the "Charter"), as follows:

Effective concurrently with the transfer of ownership or demise ownership of each of the vessels named below on the dates of acquisition indicated below, Alaska Marine Lines, Inc. ("AML" or "New Charterer") shall be substituted for and replace NSI as the chartering party with respect to each vessel identified below. The parties intend that Charter be fully assigned from NSI to AML, for all purposes, and AML accepts such assignment, and Owner hereby consents to such assignment. The hire payable by Charterer to Owner for each vessel shall be increased by the amount indicated in the table below, beginning on the date of acquisition indicated in the table below.

| Vessel | Official Number | Hire | Date of Acquisition |
|---|---|---|---|
| Polar Cloud | 555656 | $45,534/month | April 2, 2014 |
| Polar Endurance | 553042 | $33,587/month | March 16, 2014 |
| Polar King | 554888 | $58,333.33/month | March 25, 2014 |
| Polar Ranger | 569925 | $51,625/month | April 3, 2014 |
| Polar Storm | 633263 | $52,500/month | March 25, 2014 |
| Polar Viking | 568790 | $32,975/month | April 2, 2014 |

Except as provided above, all other terms and conditions of the Charter shall remain in full force and effect.

Dated: March 16, 2014

Assignor:
Northland Services, Inc.

By: _____

Its: General Manager

Owner:
Dunlap Towing Company

By: _____

Its: PRESIDENT

Assignee:
Alaska Marine Lines, Inc.

By: _____

Its: V.P.

# STANDING TIME CHARTER

| OWNER | | CHARTERER | |
|---|---|---|---|
| NAME : | DUNLAP TOWING COMPANY | NAME : | NORTHLAND SERVICES, INC |
| ADDRESS : | PO BOX 593 | ADDRESS : | P.O. BOX 24527 |
| CITY, STATE : | LA CONNER, WASHINGTON 98257 | CITY, STATE : | SEATTLE, WASHINGTON 98124 |
| CONTACT : | JAMES L. DUNLAP | CONTACT : | LARRY STAUFFER |
| TELEPHONE : | (360) 466-3114 | TELEPHONE : | (206) 892-2701 |
| E-MAIL : | JIMD@DUNLAPTOWING.COM | E-MAIL : | LSTAUFFER@NORTHLANDSERVICES.COM |

**1.   STANDING AGREEMENT**

Owner agrees to let and Charterer agrees to hire, on a time charter basis, the Tug(s) identified herein for the purposes of providing the assist, towage and cargo handling services for Charterer's Barge(s) in conjunction with Charterer's common and contract carrier barge freight operations as well as such other services within the capabilities of the Tug(s) as may be requested by Charterer. To the extent the terminology "vessel" or "vessels" is utilizes herein, it shall apply to Tugs and Barges as the context mandates.

Each of Owner's Tug(s) shall be identified on a separate Attachment A applicable to that Tug; it is contemplated that separate Attachment A's may be added to or deleted from this agreement by agreement of the parties or by operation of other provisions contained herein. Any Tug identified on an Attachment A shall be dedicated exclusively to service to Charterer pursuant to this agreement unless Charterer otherwise agrees in writing.

This agreement shall automatically terminate if the Standard Bareboat Charter between Owner and Charterer (identified therein respectively as Charterer and Owner) is terminated or is terminated as to a specific Tug. Any Tug covered by said Standard Bareboat Charter shall be deemed concurrently covered and included within this agreement, and any Tug added to or deleted from said Standard Bareboat Charter shall be deemed concurrently added to or deleted from this agreement.

**2.   CHARTER TERM**

This Standing Time Charter shall become effective on March 1, 2012 and shall continue so long as the underlying Standard Bareboat Charter between the parties is in effect.

**3.   DELIVERY AND REDELIVERY**

The Tugs shall be deemed to have been delivered by Owner to Charterer as of the effective date of this agreement and will be redelivered to Owner upon termination of this agreement or removal/deletion from service pursuant to modification of Attachment A.

4. **HIRE, CHARGES AND PAYMENT**

   A. <u>Hire</u>. The daily hire rate applicable to each Tug shall be set forth on the relevant Attachment A. Hire shall be paid in half-day increments for each day or part thereof a Tug is in service to Charterer; the reference to "Utilization Days" on Attachment A does not constitute a minimum or maximum number of days or guaranty of hire but rather hire shall only be paid when a Tug is in service to Charterer. A Tug shall be deemed to be in service to Charterer upon mobilization from its berth until completion of services and demobilization to its berth upon commencement of services until completion of services.

   B. <u>Hire Escalation.</u> Unless otherwise agreed, the daily hire rate shall be increased/decreased each year to include any actual changes in union labor rates incurred by Owner and directly relevant to Owner's crew employed aboard Tugs. Such increases/decreases shall be made upon the "crew costs" component identified on the relevant Attachment A. The remaining components of hire identified as Base Components a. - d. on the relevant Attachment A shall be increased/decreased on May 1st of each year in accordance with the average percent of change during the previous year in the Consumer Price Index (CPI), but any such escalation is not to exceed 2% for any given year. The relevant CPI series is identified by Series ID CUURA423SA01E, CUURA423SA01E which accounts for All Urban Consumers in Seattle-Tacoma-Bremerton, WA, on all items, less food and energy. The annual average percentage of change is provided by the U.S. Department of Labor, Bureau of Labor Statistics, and that figure (or 2% in the event that actual increase exceeds 2%) shall be applied to each Base Hire Component. Any given increase/decrease to any of the Base Hire Components identified on Attachment A for a given year shall be divided by 230, with the resulting figure to be added/subtracted from that particular Base Hire Component and the daily hire rate then calculated.

   C. <u>Fuel and Engine Lubricants</u>. Fuel and engine lubricants consumed by the Tug while performing services for Charterer under this agreement shall be paid/reimbursed by Charterer.

   D. <u>Cargo Time</u>. When Tug crewmembers are requested and/or required to assist with cargo handling and related tasks, then section 7, below, shall apply and Charterer shall pay cargo time at the rate identified on Attachment A for each crewmember assisting with such cargo handling and related tasks.

   E. <u>Breakdown</u>. In the event a Tug breaks down or otherwise becomes unable to perform services for a period of more than 48 hours, unless caused solely and directly by Charterer, hire shall be suspended from the time such breakdown/inability first began until performance has been resumed.

F. <u>Charges</u>. Owner shall have overall responsibility to man, victual, supply, fuel and maintain each Tug subject to such specific reimbursements as identified herein including Charterer's limited undertaking/reimbursement with respect to maintenance set forth on Attachment B, hereto. Charterer shall be responsible for those costs, charges and expenses which arise or are incurred as a direct result of its operations, cargoes and/or services which it requires from Owner such as port, harbor entrance, dockage, wharfage, pilotage, vessel assist, line handling, loading/unloading and similar charges. Any taxes, other than taxes applicable to Owner by virtue of its receipt of hire, shall be Charterer's responsibility and/or reimbursed by Charterer. To the extent Owner arranges or advances payment for any of the foregoing charges and expenses which have been allocated to Charterer, it does so as agent for Charterer and Charterer shall promptly reimburse such charges and expenses. Charterer shall be responsible for one-half of the hull insurance and P&I insurance deductible(s), not to exceed $25,000 per Tug per year during any annual term of this agreement for hull and/or P&I insurance claims submitted by Owner.

G. <u>Payment and Interest</u>. Owner shall invoice Charterer for sums due hereunder every thirty (30) days, with payment due (30) days after date of invoice. All payments shall be made in U.S. currency without deduction or setoff. Amounts due Owner in excess of thirty (30) days shall accrue interest at the rate of one percent (1%) per month.

5. **OWNER'S WARRANTIES AND PERFORMANCE**

A. <u>Warranties</u>. Owner shall use due diligence to deliver and thereafter maintain the Tug(s) in a seaworthy condition, equipped and manned sufficiently for performance and with all documentation, licensing and permits required for the routine operation of the Tug(s). Owner shall perform the transportation services with due dispatch, but makes no warranty as to speeds or arrival/departure times. Other than the foregoing, neither Owner nor the Tug(s) shall be held to any warranty whatsoever, express or implied, including without limitation any warranty of seaworthiness, fitness, suitability or workmanlike service.

B. <u>Exclusive Control</u>. Owner shall man, navigate, victual, operate, repair and supply the Tug(s) and shall have exclusive control over the Tug(s) subject to Charterer's general directions as to cargo operations and specific additional services which it is requesting; the manner and means of the performance of the general transportation services shall at all times be left to the judgment, discretion, direction and control of Owner and master. Neither Owner nor master nor crew shall be responsible for inspecting cargoes or cargo operations, including the loading, stowage, trimming, securing and/or discharging of cargoes, nor shall any advice or comments given with respect thereto enlarge Owner's responsibilities under this agreement.

C. <u>Liberties and Substitution</u>. Owner and master shall be at liberty to call at any port/place to replenish fuel, oil, stores or other necessaries and/or make repairs. Owner and master may deviate in attempt to save life or property at sea, and with respect thereto may leave the Barge(s) (and any cargoes thereon) in a position reasonably believed to be safe. Owner and master may select any route, speed or towing arrangement believed reasonable under the circumstances. In the event of accident, danger, damage, disaster or other event occurring after departure on a voyage which, in the opinion of Owner or master, prevents or may prevent the safe completion of such voyage, the Tug(s) may call at any port/place and cause cargoes to be discharged and/or stored ashore at Charterer's sole risk and expense.

D. <u>Tow Wire and Pennant Protocols.</u> Owner shall, at its sole expense, be responsible for adherence to the Tow Wire and Pennant Protocols, Attachment C, hereto.

6. **CHARTERER'S WARRANTIES AND PERFORMANCE**

   A. <u>Inspection</u>. Charterer shall be responsible for inspecting the Tug(s), including their fittings, gear and equipment, prior to and/or at delivery to determine their suitability and fitness for the intended services, with Charterer to note any deficiencies in writing to Owner prior to commencement of service. Upon Charterer's acceptance of the Tug(s) or upon the commencement of services, whichever shall first occur, it shall be deemed acknowledged by Charterer that the Tugs, including their fittings, gear and equipment, are in all respects suitable and fit for the intended services.

   B. <u>Lawful Carriage; Hazardous Cargoes</u>. Charterer shall not request the Tug(s) be employed in any unlawful carriage or trade whatsoever, and Charterer shall not provide any unlawful cargoes nor cargoes the carriage of which would violate any applicable law, statute or regulation.

   C. <u>Cargo Operations</u>. Charterer shall be responsible for the loading, stowage, trimming, securing, lashing, unlashing and discharging of all cargoes, with all such cargo operations to be performed at Charterer's risk and expense, under Charterer's direction and control and subject to Charterer's final approval. Charterer may engage a marine surveyor to conduct a load/stow survey promptly following completion of loading, stowage and securing of cargoes and shall comply with all recommendations issued by any such surveyor. All cargoes shall be packaged, stowed, secured and lashed sufficiently to withstand the hazards of open ocean transportation by uncovered barge, including exposure to moisture, humidity, heat, rolling, pitching and similar barge movements.

   D. <u>Cargo Documentation</u>. Charterer shall be responsible for all cargo manifests, stowage plans, receipts, invoices, bills of lading and other documentation relating to the cargoes or the transportation thereof. Charterer shall be responsible for dealing with the shippers, consignees and owners of the cargoes as well as with any other person or entity having an interest in, or making claim to, through or with respect to the cargoes.

7. **CARGO HANDLING BY TUG CREWMEMBERS**

Charterer may utilize Tug crewmembers to assist with cargo handling and related tasks. While so employed, such crewmembers shall be completely under Charterer's supervision, direction and control and deemed borrowed servants of Charterer, with Charterer solely responsible for all loss, damage and/or liability involving cargoes and all third party loss, damage and/or liability caused in any way by such crewmembers while so performing. Owner shall be responsible for payroll, withholding, employee benefit and similar direct employment related obligations for such crewmembers.

The bodily injury, illness and/or death of such crewmembers while performing cargo handling and related tasks shall be as addressed in subsection 8.A(1), below.

8. **LIABILITY AND INDEMNITY**

   A. <u>Allocation of Liabilities</u>.

   (1). <u>Owner</u>. Owner shall be responsible for all loss, damage, expense, liability, claim and/or suit applicable to its Tug(s), personal property and employees as well as its subcontractors, vendors and invitees (if any), howsoever caused and even if resulting from the negligence or other legal fault of Charterer.

 (2). <u>Charterer</u>. Charterer shall be responsible for all loss, damage, expense, liability, claim and/or suit applicable to the Barge(s) as well as its cargoes (including general average and salvage charges), personal property and employees, including those of its subcontractors, vendors and invitees, howsoever caused and even if resulting from the negligence or other legal fault of Owner or the unseaworthiness of a Vessel.

 (3). <u>Both</u>. As to any matter not specifically addressed in this agreement, each party shall be responsible for all loss, damage, expense, liability, claim and/or suit to the extent of its proportionate degree of fault or legal liability.

B. <u>Indemnity</u>. Each party agrees to indemnify and hold harmless the other party (including costs and legal fees) of and from any loss, damage, claim, liability and/or suit allocated to it pursuant to subsection 8.A, above, and shall waive any immunity from suit and/or exclusivity of remedy afforded by any workers compensation act or similar law in furtherance thereof.

## 9. INSURANCE

Unless modified specifically by an Addendum to this Agreement, the following insurance requirements shall be applicable to the parties and the Tug(s) and Barge(s):

A. <u>Vessels</u>. Each party shall maintain, at its expense including premiums, deductibles and all other policy related charges, the following insurances with respect to its vessels:

 (1). hull and machinery insurance upon the vessels pursuant to Pacific Coast Tug/Barge Form (1979), or equivalent, to the full actual market values thereof;

 (2). protection & indemnity insurance upon the vessels pursuant to Form SP-23 (Revised 1/56) or broader with minimum limits of $10,000,000 per occurrence, or a standard P&I Club entry; and

 (3). pollution and environmental liability insurance, including coverage for damages, cleanup and restoration costs, in amounts no less than those limits required by applicable state and federal laws.

B. <u>Charterer</u>. Additionally, Charterer shall maintain, at its expense including premiums, deductibles and all other policy related charges, the following insurances:

 (1). Full form cargo legal liability insurance with limits to the values of cargoes transported aboard Charterer's Barges;

 (2). workers compensation and employers liability insurance upon its employees and the employees of its subcontractors, extended to include coverage under the Longshore Act, and all applicable state acts, with statutory limits for workers compensation and minimum limits of $10,000,000 per occurrence for employers liability; and

C. <u>Insuring Conditions</u>.

 (1). Each insurance shall be specifically endorsed to provide a waiver of subrogation as to the non-procuring party.

(2). All insurances shall be upon forms and with underwriting security acceptable to the non-procuring party. Prior to commencement of services, each party shall provide the other with certificates or complete copies of policies, as requested, confirming that the insurances required above are being maintained as set forth in this agreement. There shall be no material change in any insurance policy during the charter term without the prior written consent of the non-procuring party. Each insurance policy shall be specifically endorsed to require at least ten (10) days advance written notice to both parties in the event of any cancellation, non-renewal or other material change in policy terms.

(3). Owner's tower's liability insurance (which is provided in the hull and machinery insurance policy applicable to the Tug) shall be endorsed to be solely responsible for all first party loss or damage to the Barge and its cargoes and third party liability against the Barge arising while the Barge is under control of the Tug and as a result of the actions of the Tug, its master and/or crew, so long as the Customer is not actively at fault to any degree with respect to the Barge.

D. <u>Failure of Insurance</u>. Each party shall indemnify and hold harmless (including costs and legal fees) the other party from any policy deductible or premium obligation allocated to it, from the failure to provide and maintain an insurance as required in this agreement, from the failure (for any reason) of any insurance, and/or from any other breach of the insuring requirements set forth in this agreement. The foregoing indemnification agreement shall cover, as well, any breach of warranty or other policy condition.

## 10. GENERAL AVERAGE

General average shall be adjusted, stated and settled under York-Antwerp Rules 1994, excluding Rule B, at a port/place selected by Owner, and as to matters not provided for by said Rules according to the laws and usage of the Port of Seattle, with the Tug and Barge(s) not deemed involved in a common maritime adventure unless each such vessel is actually and directly exposed to a common peril; a vessel is not in common peril with another Vessel if by disconnecting from such other vessel it is in a position of safety or ceases to be actually and directly exposed to such peril. For purposes of said Rules, the parties expressly acknowledge that the cargoes are carried in accordance with the recognized custom of the trade.

To the extent required by Owner, average agreement, bond and additional security shall be furnished by Charterer prior to discharge/release of cargoes. Any cash deposit shall be payable in U.S. currency, remitted to an average adjuster of Owner's choosing and held in a special account in the adjuster's name, with interest thereon to become a part thereof pending settlement of general average.

In the event of accident, danger, damage or disaster, before or after commencement of a voyage, resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequences of which Owner is not responsible by statute, contract or otherwise, the cargoes and Charterer shall contribute with Owner and the vessels in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred with respect to the cargoes. The contribution of cargoes and Charterer to general average shall be paid to Owner even when such average is the result of fault, neglect or error of the master, pilot or crew. If a salving ship is owned/operated by Owner, salvage shall be paid for as fully and in the same manner as if such salvage ship belonged to strangers.

## 11. BOTH TO BLAME

In the event of cargo damage resulting from collision, if the vessels or either of them should collide or come into contact with another ship or object as a result of the negligence of the other ship or object and any act, neglect or default of master, mariners, pilot or servants of Owner in the navigation, management or maintenance of the vessels, Charterer shall indemnify Owner and the vessels from and against all loss

and liability to the other or non-carrying ship, her owners and any third parties insofar as such loss and liability represents a loss of, damage to or any claim whatsoever of Charterer, the owners of the cargoes and/or their underwriters, paid or payable by the other or non-carrying ship, her owners or third parties to Charterer, the owners of the cargoes or their underwriters and set off, recouped or recovered by the other or non-carrying ship, her owners or any third parties as a part of their claim(s) against Owner and/or the vessels. The foregoing shall apply when the owners, operators or those in charge of any ship or object other than or in addition to those colliding are at fault with respect to such collision or contact.

## 12. FORCE MAJEURE

Neither party shall be responsible for delay or inability to perform caused by: acts of God; perils of the sea; adverse weather conditions; errors in the navigation or management of a vessel; breakdown or defects in the hull, machinery, equipment, hawsers or lines of a vessel not resulting from a lack of due diligence to make the vessel seaworthy at the commencement of voyage; strikes and/or labor troubles; war; restraint or seizure by government or belligerent party; riot or civil commotion; theft or pilferage; epidemic; quarantine; embargo; deviation in attempt to save life or property at sea; fire or explosion; or any other cause which is beyond the actual direct control of a party.

## 13. CONSEQUENTIAL DAMAGES

Neither Owner, Charterer nor the vessels shall be responsible for any special or consequential damages whatsoever, including, without limitation, extra expense, loss of earnings, loss of profits, loss of use and business interruption, whether resulting from negligence, unseaworthiness, breach of this agreement or otherwise, even if the possibility of such damages may have been foreseeable.

## 14. LIMITATION OF LIABILITY

This agreement is not a personal contract nor shall it otherwise operate to prohibit or deny either party from the benefit of any limitation upon or exemption from liability afforded to vessel owners.

## 15. EXTENSION OF BENEFITS

All exceptions to, exemptions from, defenses to, immunities from and/or limitations upon liability granted to a party, whether by operation of this agreement or applicable law, shall be automatically extended to and for the benefit of: all lawful business entities parent to, subsidiary of, affiliated with and/or under the management or control of that party as well as the shareholders, members, managers, officers, directors, employees and agents of each such entity; and all Vessel(s) provided by that party under this agreement, including its/their owners, demise charterers, managers, operators, masters, officers and crew.

## 16. LIENS

Neither party shall create or suffer to exist any lien for which it might be responsible upon a vessel of the other party, and each shall indemnify and hold harmless the other of and from such liens.

## 17. ASSIGNMENT AND SUBCHARTERING

Neither party may assign this agreement without the prior written assent of the other party. Charterer shall not subcharter the Vessels or either of them without the prior written assent of Owner.

## 18. SURVIVAL OF ACTION

All obligations of either party, including obligations to insure, reimburse, indemnify, defend, hold harmless and pay, shall survive termination, cancellation or expiration of this agreement.

19. APPLICABLE LAW AND JURISDICTION

This agreement shall be governed by the general maritime law of the United States or by the laws of the State of Washington in the event there is no applicable general maritime rule of law. However, Owner and Charterer hereby specifically agree that the Bisso decision and general maritime laws resulting therefrom shall not be applicable to this agreement nor the relationship between the parties, but rather such shall be governed by the contractual relationships and allocations set forth herein; each agrees that it will not assert the applicability of the Bisso decision in the event of any dispute arising hereunder. The parties submit to the exclusive personal and subject matter jurisdiction of the courts located in Seattle, Washington with respect to any litigation arising out of this agreement, with the substantially prevailing party entitled to recover its legal fees and costs.

20. COUNTERPARTS AND EXECUTION

This agreement may be executed in counterparts and/or by facsimile or other electronic exchange of signatures, with all such counterparts deemed the same single agreement and signatures exchanged by facsimile or other electronic means deemed equivalent to original signatures.

21. INTEGRATION AND HEADINGS

This constitutes the entire agreement between the parties and expressly supersedes all prior and contemporaneous agreements, written and oral. This agreement shall not be modified except through a writing signed by both parties. This agreement shall be construed neutrally, and as the commemoration of the mutual assent of both parties, rather than for or against a party. The headings used above are for convenience of reference only and are not substantive.

DATED THIS 10TH DAY OF May, 2012.

OWNER:

*[signature]*
Authorized Signature
JAMES L. DUNLAP
PRESIDENT
Printed Name and Title

~~CUSTOMER:~~ Charterer

*[signature]*
Authorized Signature
Larry Keith Stauffer
President / CEO
Printed Name and Title